The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Peter C. Cavanaugh presiding. Thank you. Good morning. We'll next call 4-23-0641, People of the State of Illinois v. Randy Martez-Turner. The counsel for the appellant, please state your name for the record. May it please the court, Your Honor, this is Amy O'Toole from the Office of the Appellate Defender and counsel for Randy Turner. Thank you. And counsel for the appellate? Good morning, Your Honors. Katrina Kuhn for the People. Thank you. Ms. O'Toole, you may proceed. May it please the court, counsel, my name is Amy O'Toole and I'm from the Office of the Appellate Defender representing Defendant Appellant Randy Turner. Your Honors, I intend to address both arguments on appeal today, whether the pepper spray taken from an officer is a weapon under the disarming a peace officer statute and whether Randy Turner's 44-year sentence is excessive. Randy Turner is serving a 30-year sentence in prison for his conviction under the disarming statute for taking pepper spray from a state trooper. The trial court's statutory interpretation under the statute that renders pepper spray an ordinary object as a weapon was not the intent of the legislature and the purpose of the statute. It also ignores statutory exceptions for pepper spray and definitions in the unlawful use of weapon statute. We can assume that the legislature didn't intend such an absurd and unjust result here for taking pepper spray and the trial court's erroneous interpretation resulting in what I call a perfect storm here for Randy Turner, who received not only the maximum sentence under the disarming statute of 15 years, but also the trial court extended that sentence and doubled it to 30 years. And then the trial court sentenced him to serve that sentence consecutively with the other counts. Well, why do we think that this is an absurd statutory interpretation? We know the statute used to say firearm and it was amended to say weapon. Is that right? Yes, Your Honor. The statute was amended in 2004. So we would certainly not be arguing that a firearm was not a weapon. It would be clear. But the statute clearly now intends to include more than a firearm. Why wouldn't pepper spray be right smack in the middle of what a weapon would be? Well, Your Honor, when the statute was amended, there is no legislative history to glean exactly what the legislature was thinking. But certainly when it was amended, the term firearm was probably antiquated. But here we have to consider the term weapon, not only in the context of this particular statute, but also the section in which the statute lies and as well as the act in which it is found, which is the entire criminal code. So we can't construe the term weapon in isolation here. We have to consider how that term weapon is used. And in fact, in the unlawful use of weapon statute, it's specifically excluded as a weapon pepper spray. Well, it's not excluded as a weapon. It's excluded as something that can't be carried. So it is permissibly carried. But the unlawful use of weapon statute is really addressing a different purpose. It's addressing what may be carried lawfully by citizens or what would be unlawful to be carried. Doesn't the fact that they bothered to exclude it confirm that it's a weapon? No, I don't believe it does, Your Honor. I believe here the fact that they excluded it can't be ignored. What we're dealing with here under the disarming statute is that taking an object from the officer is the completion of the violation of the statute. How Mr. Turner used it or if he even used it is really not relevant. And I think that all parties agree to that, what constitutes a violation. So here, when you take an object that's permissible to be carried, it's not licensed. It's not regulated. There's no restrictions. Are billy clubs licensed or regulated? They're precluded to be carried under the UUW, Your Honor. Well, what other non-firearm weapon other than a billy club could weapon have been extended to mean? Well, it's a definition in the UUW that includes many different things. We have knives of a certain extent, automatic knives. I'm just saying in terms of what an officer would normally carry. Right, Your Honor. Well, bludgeon is particularly named in the UUW and that's not permitted for residents of Illinois to be carried or possessed. And likewise, you know, a taser or a stun gun is regulated under UUW as well as other codes. But the fact that the statute went to the trouble and it didn't say a non-lethal noxious liquid is not a weapon for purposes of the statute. It says you can't carry any of these unlawful weapons, but we will not include, they may as well have said this weapon, which is pepper spray. In other words, they're not saying it's not a weapon. They're giving permission for that weapon to be carried lawfully by citizens. I don't agree, Your Honor. I believe that the exception states that it's not a weapon. And I think you can look to People v. Runge as well as the Seventh Circuit Court of Appeals specifically said that pepper spray is not a weapon in Illinois and cites to the UUW statute. The exception is to a weapon means that it's not a weapon. So would it be a weapon if it was being carried by a 17-year-old? Well, there is a small restriction as to the age of carrying pepper spray, and I believe it may be a misdemeanor or something if a younger than 18-year-old brother would be carrying that pepper spray. But it can't be a weapon if it's carried by a 17-year-old and not a weapon if it's carried by an 18-year-old. It's still a weapon. It's just a question of who has permission to carry it. Well, Mr. Turner here was well over the age of 18, and it doesn't have an exception. And he wasn't charged under this statute, but we're only looking to this statute because you think it's helpful to interpret the meaning of the statute under which he was charged. So I'm just trying to understand what to glean from that. And it seems to me that the definition of weapon in the relevant statute is being given for a purpose different than the statute which criminalizes carrying certain weapons. Well, that may be true, Your Honor. However, here we're talking about the same term, weapon, and we're talking about the object. And if you're going to use how the object is actually used, I think you're going far afield of what the legislature intended by the purpose of the statute. And when the statute was enacted, we have to presume that here the legislature knew of the exception in the UUW. It knew of the definitions of things that it specifically called weapons. It chose the term weapon, but here didn't say, oh, you know, the UUW doesn't apply. Here it's presumed that it knew about prior judicial decisions related to pepper spray. It also knew about the definition in the UUW and didn't make a specific exception to exclude that definition. I guess what I'm stumbling with is you're viewing the exclusion of pepper spray in the unauthorized use statute as showing us that it's not a weapon. Whereas I look at it and I think, well, they wouldn't mention it if it weren't a weapon, as they choose for other reasons to exclude it. I mean, they don't say this doesn't include a ham sandwich that you want to hit somebody over the head with, because that's not a weapon. That doesn't need to be addressed in the statute. Well, I think it's instructive that it says except pepper spray, or it doesn't say, it says except a non-lethal noxious gas. And it also doesn't limit it by other license or regulations. You don't need a license or a regulation to carry pepper spray in Illinois. It's a natural substance, it's freely carried, it's not lethal, and it doesn't cause a permanent injury. I think it's much different than these other weapons that are specifically defined. And back to the legislation purpose, I don't think we can sit here and craft a whole new definition that has really nothing to do with the context of the statute and flies in the face of the UUW. And then say, oh, by the way, we also intended to exclude that exception that the UUW has. I think that's turning this particular legislature of intent on its head. Well, but isn't the question much different about what weapons do we think citizens should or shouldn't be able to carry, as opposed to what things would it be okay to forcefully take from a police officer? Aren't those really materially different questions with materially different policy judgments involved? Well, I can understand what you're saying, but I also think that the legislature didn't choose a different term. It chose the term weapon here. And we have to have some continuity to how weapon is used across the criminal code. I don't think we can pick and choose, oh, we want weapon to mean something here under the disarming statute, and we want it to mean something else under the UUW. The UUW is broad. It's not only talking about possessing weapons. It's possession and carrying and where it's used, if it can be used by a school, and all sorts of different restrictions. But I don't think the legislature was excluding the UUW when it drafted the statute, and it's been in effect for decades here. And I think that the amendment purely had to do with just the antiquated nature of the firearm. In fact, there's no statutory or there's no judicial decision that addresses anything broader than lethal weapons here. Well, counsel, outside of the context of the UUW statute, I believe there are some cases that indicate that things such as pepper spray, things of that nature that are used to temporarily disable others is an intrinsic weapon. Well, I think, Your Honor, you're referring to the armed robbery cases, such as People v. Curry and similar cases along those lines. But I think the question there is much different. In fact, that question is for the fact finder, the jury in those situations to determine the manner in which those objects were used. And here, I don't think this is a question of law, is to what did the legislature intend by the term weapon? The fact finder is not analyzing here. And if I can move on to my second point, what I believe happened here is the trial court erroneously jumped to looking to how this pepper spray was used on the state trooper to determine it was a weapon. The trial judge said, and I quote, the OC spray was purely being used by the defendant is a weapon here. It improperly considered how that pepper spray was used. And I think all parties agree that that use has nothing to do with whether or not this is a weapon under the disarming statute. It's something of an illustration, though, right? I mean, I agree this would be a harder case if the defendant took the officer's belt and used it against because a belt can be used as a weapon, but it's not intrinsically a weapon. But pepper spray's purpose is to be used to, in some way, disable another person. It is more intrinsically a weapon. It's correct. It's using, it's used, it's used as proper here. He used the, the object properly, but I don't think that's really relevant to the statutory interpretation. Had he put the pepper spray in his pocket, he still would have violated the statute here. And I think that's absurd. I think that's an absurd result. I don't think the legislature intended an ordinary object that has no restrictions to be a weapon under the statute. Well, if he took the officer's billy club and put it in his pocket, he would still be guilty. I would agree. So not sure what that, where that leaves us. Well, it leaves us that if the legislature wanted to define weapon differently than how it's used in these other statutes, then it would have done so. So I don't think we can sit here and create, craft a whole new definition for weapon that is contrary to the other definitions. Unless there's any other questions, I'd like to move to my second issue, excessive sentence. A sentence of 44 years here is far too punitive of a sentence and is manifestly disproportionate given the nature of Randy Turner's acts of taking pepper spray and committing acts of aggravated battery. Such a lengthy sentence is shocking here, given the nature of these crimes where the victim had no permanent injury and the record supported a significant amount of mitigation evidence. The trial court abused its discretion by disregarding the mitigation evidence here. We have concrete evidence of mental illness. And we have statements of remorse, acceptance of responsibility for his acts. And the trial court disregarded all of that evidence and instead sentenced the maximum amount in all the counts here. And extended the sentence of count 1 to 30 years and then ordered that these sentences be served consecutively. Despite the conclusive evidence of mental illness of Mr. Turner, the trial court improperly dismissed that mitigation evidence and stated, and I quote, he does suffer from some possible mental health issues, but by labeling. Excuse me, but I was wanted to pursue that for a minute. So why are you saying that the trial court disregarded it? I mean, the trial court indicated it certainly reviewed the report and summarize by saying possible. I mean, the report did indicate some XS1 diagnoses, schizoaffective disorder, but why are you saying the trial court disregarded it? I mean, this is a trial court can weigh any of these factors any way it wishes, correct? Yes, Your Honor. However, here the trial court, instead of considering that mitigation evidence, we have the result of a maximum sentence across 10 counts at that time of sentencing. So he gave the maximum sentence and extended the sentences to count 1 to 30 years in light of mitigation evidence. And it's not just XS1, it's XS2, XS3, and it's hospitalizations. But the factor itself in the criminal code indicates that there has to be some connection between the mental illness and the offense. And I believe the trial court's comments indicated that it was looking and certainly giving much more weight to the defendant's use of PCP and drugs than any mental illness. Well, he may have considered the drug addiction is aggravating here, but that doesn't dismiss the evidence of mental illness. Dr. Killian, who is a psychiatrist here, issued an evaluation report and made the diagnoses, which you mentioned is schizoaffective disorder, PTSD. And moreover, he cited the hospitalizations here. So this is something that's been documented. And the fact that he went to other issues that maybe weren't as mitigating doesn't absolve the evidence of mental illness here. And he had a hospitalization less than a year prior to this incident. He was seen again at the hospital in August, again in September. And the fact that he had drug use in his system means that he probably self-medicated his mental illness. And as far as you made a mention of the mental illness being connected to the axiar, well, certainly he did have PCP in his system, but he also behaved, which I think is clear from the video, which I'm sure your honors have seen, he also behaved as though somebody was mentally ill. He ran out in front of an interstate highway. It's also significant that Dr. Killian found a significant amount of mitigation evidence for Mr. Turner, and I'm quoting from the report, including his very traumatic childhood, a chronic psychotic disorder for which he's not being treated at the time of the assault. And he had some psychotic symptoms at the time of the assault, and his PTSD almost certainly contributed to the assault of Trooper Niehaus. But the trial court failed to actually consider that mitigation evidence when it gave him the maximum sentence and extended that sentence, in fact doubled it, and came out with a total maximum sentence of 44 years here. I don't think that a maximum sentence of 44 years comports with the constitutional objective of restoring Mr. Turner to useful citizenship. Because it's clear that the court did not actually consider these mitigation factors in fashioning Mr. Turner's sentence. This court should reduce Mr. Turner's sentence, or alternatively, he deserves a new and fair sentencing hearing. Thank you, Your Honor. I reserve the remaining time for rebuttal. Thank you, Ms. O'Toole. Ms. Kuhn? Good morning, Your Honors. Katrina Kuhn for the people of the state of Illinois, and may it please the court. Defendant disarmed Trooper Niehaus of a weapon by taking the oleoresin capsizum spray from the trooper's duty belt at a traffic stop. Defendant's arguments conflict with the language and the purpose of the statute and fail every test of statutory construction. The first consideration given when interpreting a statute, which is a question of law, is the language of the statute. That is the clearest indication of the legislature's intent. As Your Honors have noted, the legislature changed the wording from firearm to weapon. Furthermore, the legislature chose not to define weapon. The legislature could have done so. The legislature chose not to define weapon in this statute. Therefore, the term is given its plain meaning, and the term weapon has an ordinary and popularly understood meaning. I cited one in my brief just as an example of a dictionary definition of weapon. Nothing in the disarming statute or the definition limits the weapon to a firearm. Counsel O'Toole indeed conceded in the brief that the taser could be considered a weapon. It extends beyond firearm. By using the term weapon instead of firearm, the legislature indicated its intent to include any item carried by the officers that has the ability to harm, threaten, or injure. And again, this goes a little bit into legislative intent, which I will get to, which is looked at if the term weapon is found to be ambiguous. However, the legislative intent of this statute is clear. As Justice Doherty has indicated, it is intended to protect police officers and prevent any item taken from an officer that could be used against the officer or used against any member of the public. And it's also preventing the officer from using it against the defendant. The definition suggested by Counsel O'Toole is, would ask this court to depart from the plain language of the statute and read into the statute limitations or conditions that the legislator did not express. What about counsel's argument that we should read the word weapon in conjunction with the definitions in the unauthorized use statute? Well, Your Honor, that goes to an issue of statutory construction. And my response is that, first of all, again, there was no definition. If the legislature wanted to include a definition in the statute, it would have. It did not incorporate any other definitions. And it's presumed that the legislature was aware of the use of the term in other statutes and that by defining it in other sections, that it has a different application. And to start off with the UUW statute, it specifies various items. But as Justice Doherty said, my argument is that it recognized that pepper spray can be a weapon. The legislature excluded it in that statute for the reason of allowing people to carry it in self-defense. That is the purpose of the exclusion. Pardon me. That is the purpose of that exclusion. Counsel also compared it to an adjacent statute, which is Article 31A, which is interference with penal institutions, which protects workers in penal institutions. And that defines a weapon in several ways, including a razor, a broken bottle, a piece of glass. That statute clearly has a different purpose. Those are things that could be obtained in a prison or a jail, as opposed to this statute, which is intended to apply to items that would be carried by a police officer. And again, the tenant of in pari materia is raised by the defendant and statutes are only considered in pari materia when they have the same purpose or object or relate to the same person or thing. And that is not the case here. Counsel Atul also correctly stated that this is a case where there does not seem to be a judicial decision. This is an issue of first impression. The trooper here was carrying O.C. spray that officers use. He was carrying it in the line of duty and the court received evidence that this was spray that was carried by the officer on his duty belt. And the court can look to People v. Runge, the cases cited in Page 23 of the People's Brief from other jurisdictions that indicate the difference between pepper spray or O.C. spray that is carried by an officer versus spray that is carried by available to the general public at a drugstore, for example. The defendant's position also entirely contradicts the legislative intent here. The purpose of the statute is to prohibit the taking of weapons which deprives an officer of their use and enables the offender to use it against the officer, to incapacitate the officer, to immobilize the officer, and also the legislative intent. The defendant referred in her brief to the axiom that statute should be construed in a defendant's favor. The rule of lenity cannot be applied to defeat legislative intent. It is only applied when legislative intent cannot be determined from the language or the statutory construction. And for all the reasons stated here that it can be determined on those bases. If I could turn to the sentencing issue, defense counsel Atul is challenging the excessiveness of the state sentence. It's therefore challenging the discretion of the trial court in handing down the sentence. And the court was presented with and considered evidence of defendant's mental health history and drug addiction and was well within its discretion to impose the maximum sentence here. Does that not mean, counsel, that the trial court, since it did impose the maximum, gave the defendant's mental illness no regard and no weight whatsoever? Your Honor, I would respectfully disagree. There is case law cited in my brief. The presence of evidence and mitigation does not require the court to impose less than a maximum term. And the court is presumed to consider mitigating evidence presented to it. Here, the court indicated that it considered all of this evidence. The fact that it imposed the extended term, that is also a reflection of the defendant's criminal history, which was considerable, which is part of my argument. Defendant, this was not a first offense. Defendant had a long criminal history. And the most important factor here is the seriousness of the offense. The people have acknowledged that mental health is a statutory factor. However, here, defendant agrees that his acts were inexcusable and unprovoked. His acts, as shown in the video, demonstrate forethought. He sprayed the trooper. He tried to get the trooper's firearm out of his holster. He later admitted that he was having a rush and that he wanted to get away. And he also admitted that he would have killed the officer if he would have gotten the firearm. This is done with forethought. And this was intentional and this was egregious. The trial court expressly acknowledged that the defendant suffered from mental health issues. That is at record page 172. The trial court heard defendant speaking allocution. Just because the trial court did not describe defendant's mental health issues in detail when it rendered its sentence does not mean that it did not consider them. Indeed, the court is presumed to have considered them. And again, that mitigating evidence does not require less than a maximum term. That is the discretion of the trial court. And just as to the mental health history, the defendant had been prescribed medication for PTSD and bipolarity in 2021. His behavior began to improve. He then stopped taking it and he began to self-medicate with intoxicants and alcohol. Now, Dr. Killian did include in his report that even though defendant had chronic psychotic disorder, and this is at page nine of the impounded record, it was not the primary reason for his brutal assault on Trooper Niehaus. So the court could conclude that this was an indication of defendant's intent and not of some form of mental illness. The trial court took a recess to read Dr. Killian's report, stated at its start of sentencing that it received and reviewed the PSI. It had ample time to consider Dr. Killian's report. The PSI and Dr. Killian's report were largely duplicative. The portion of the Dr. Killian's report with the diagnoses and findings was approximately one page that the trial court could have reviewed and did review during recess. And for all those reasons, the court fully weighed the defendant's mental health, but was not required to give it weight and mitigation. The council also raises defendant's drug addiction. Drug addiction is not a statutory factor in aggravation or mitigation. This court has held an Akisto and Sturgeon, which are cited in the people's brief, that drug use can be a factor in aggravation if it causes unpredictability and criminal behavior. Well, I think that's what we have here. Drug addiction can be an aggravating factor if it increases the seriousness of the offense and the need to protect society and the need for deterrence. This defendant admitted that his convictions arose from the need to chase a high. He admitted to driving after smoking PCP and marijuana. His adult criminal history began in 2001. He had at least 10 prior offenses, including robbery, armed robbery, possession of a stolen vehicle, criminal trespass, domestic battery, as laid out in the PSI. Defendant continues to reoffend. And the court might wonder if defendant has received meaningful drug treatment. He did enter treatment as explained in the PSI, but he did not complete it. He stopped it. And at some point, this defendant's actions become defendant's responsibility. And that time has long since passed. Your Honors, defendant claims that there was no injury to this to Trooper Nehouse. Trooper Nehouse sustained bodily injury. He had a fractured vertebrae and he could not work for seven weeks. In conclusion on the sentencing issue, Your Honors, defendant's mental illness and drug use were well documented, fully presented to the trial court and fully considered by the trial court. The court correctly found the lengthy sentence necessary for the protection of the public, among other statutory sentencing considerations. Your Honors, may I answer any questions for the court? Seeing none. All right. Thank you, counsel. Chortul, rebuttal. Your Honors, going back to the first argument, the state has asked this court to construe the term weapon to mean anything that the officer carries. I think what we're talking about here is pencils, flashlights, and everyday objects that there's no support that the legislature intended such a broad interpretation of the term weapon. We don't have to decide that today. What we have to decide is whether pepper spray is included in that term. That's true. That's the issue at hand here, Your Honor. But we have to do so not in a vacuum here. We can't do an isolation to how the term weapons used in the context of the act. Here we have the term weapon being used in an adjacent statute, and that statute specifically incorporated the UUW. The state made reference to the interference with penal institution. That, in my view, is the same subject matter here. We're not talking about a completely different statute. What we see in that statute is the legislature showing us that when they want to incorporate the definitions from 24-1, they know how to do it, and they did it. But they didn't choose to do that in the statute at issue here. Yes, Your Honor, that may be true, but I think the reason why they did that in the other penal interference statute was that the legislature was trying to make the point that inmates that have certain everyday objects might, in fact, be used as weapons in that setting. I don't think the legislature was intending to really address the UUW in the penal institution. It was trying to come up with a definition that maybe the UUW didn't include. What it did is it expanded the definition beyond the UUW. The whole entire point that we can sit here and say, oh, you can look at the UUW here, but you can't here because they didn't specifically call it. If the legislature had to refer to each and every term and how it was used in different statutes and across the criminal code, each statute would be rather lengthy and really hard to decipher. So here, I don't think we can read it in isolation of the UUW. But it didn't make it very long when they added it to the penal institution provision, right? The definition different than the UUW. But it just incorporated it, and if they wanted to do what you think they should have done, they could have just incorporated it in 31-1. Right. And I'm not an expert on every statute here, every term, whether it's included in the code. But I do think that there's other terms here that are commonly used, and I don't think for each and every term we have to sit and figure out, well, is it used in the UUW? Is it used in another statute, and what does it mean? I don't think that's the intention. I don't think that the plain meaning rule is so strict that we can't look at continuity across the use of terms across the criminal code. But what about opposing arguments, opposing counsel's argument that when the purpose of the statute is different, then certainly the definition of weapon can be different in what it encompasses? Doesn't that make sense? It does make sense, and I'm not suggesting that the penal institution has a slightly different purpose than the disarming statute. But, again, they are under the same part and under the same act here. But I do think what we have to do is use some common sense here that we can't go far afield and craft an entirely new definition of weapon that flies in the face of the UUW definition. I don't know that there's any basis for doing that. Just, Your Honor, as far as excessive sentence, I think that the state has taken some liberties with Dr. Killian's report here. It's well documented. His mental illness has been well documented, and there's even a section that Dr. Killian has said that there's sufficient amount of mitigation. Now, giving lip service to the mitigation evidence here is not the same as actually considering it. And what the trial court did was mention that it was possible that he had mental illness, but he dismissed concrete evidence such as hospitalizations and other diagnoses from a doctor who diagnosed him with schizophrenic disorder, PTSD, and personality disorder. I don't think we can give a maximum sentence to someone when there's no evidence that he actually considered the mitigation evidence. It's an abuse of discretion, Your Honor. And nowhere in the record is there a mention of the objective of restoring Mr. Turner to useful citizenship here. It seems that that objective was completely dismissed here. Counsel, you're out of time. Are you summing up now? Yes, Your Honor. This court should reduce Mr. Turner's sentence, or alternatively, he deserves a new sentencing hearing. And the sentences that exist is far beyond a sentence that would provide adequate retribution to Mr. Turner. Thank you, Your Honors. Thank you, Counsel. Thank you both. The court will take this matter under advisement and now stands in recess.